**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jun 06 2012, 8:38 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**PATRICIA CARESS McMATH**
Marion Co. Public Defender's Office
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**MONIKA PREKOPA TALBOT**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

ROBERT JOHNSON, JR.,                )
                                    )
    Appellant-Defendant,         )
                                    )
        vs.                  )    No.  49A02-1108-CR-712
                                    )
STATE OF INDIANA,                   )
                                    )
    Appellee-Plaintiff.          )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Carol J. Orbison, Judge
Cause No. 49G22-0905-MR-52138

**June 6, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BAKER, Judge**

Appellant-defendant Robert Johnson, Jr., appeals his convictions for Felony Murder,[1] a felony, and Robbery,[2] a class B felony. More particularly, Johnson argues that the trial court erred by admitting testimony that Johnson called a woman a snitch and then shot her in the face when the State failed to establish a nexus between that incident and the offenses for which Johnson was being tried. Finding no reversible error, we affirm.

<u>FACTS</u>

In January 2009, sixteen-year-old Jeremy Swift lived at the Bristol Square Apartments in Indianapolis with his mother and two sisters. Jeremy and his cousin, Ramon Swift, would often spend time at the Lakeview Apartments, where Ramon's brother, Romell, lived. Ramon was acquainted with Johnson, whose nickname was Little Rob, and his brother Dion Johnson; however, Jeremy was not good friends with them. Tiara Collins was very good friends with Jeremy and also knew Victor Smith and Johnson. On January 10, 2009, Johnson called Tiara to ask if she knew anyone "with some weed" and Tiara responded, "[y]es, Jeremy." Tr. p. 110. Tiara gave Johnson Jeremy's phone number.

On January 14, 2009, Jeremy, Ramon, and Justin Callaway were at the Lakeview Apartments in Jeremy's older model gold Buick LeSabre, and when they pulled up in front of Romell's residence, Jeremy received a call from Johnson. After the call, Jeremy

---

[1] Ind. Code § 35-42-1-1(2).

[2] I.C. § 35-42-5-1.

drove the group to the back of the apartment complex and parked. The group then saw Johnson approach. Johnson entered Jeremy's car just long enough to purchase $5 of marijuana. Johnson told Jeremy that he would be contacting him for more marijuana. After the transaction, Jeremy, Ramon, and Callaway drove off. Jeremy said that he did not really trust Johnson and that he felt "weird" around him. State's Ex. 25 p. 23-24.

On January 25, 2009, at approximately 6:00 p.m., Jeremy and Callaway were sitting in front of Chris McClinton's residence at the Lakeview Apartments when Jeremy received a phone call from someone who wanted marijuana. Jeremy and Callaway then drove to another location within the complex and parked.

Johnson was waiting for them with a companion. Callaway had $10 worth of bagged marijuana with him. Johnson and the companion entered the vehicle and because they only wanted $5 worth of marijuana, Callaway took out one-half of the marijuana and put it into another bag. Callaway then handed the bag of marijuana to Johnson, who handed him a $5 bill. Johnson and the companion then exited the vehicle.

Callaway did not hear the companion's door close and then felt someone pulling on his hood from the back. When Callaway turned around, he saw the companion standing outside and holding a gun at Callaway's face. Jeremy put the vehicle into reverse but it quickly started spinning, and Jeremy lost control and struck a parked vehicle. Jeremy's vehicle stalled, so he jumped out and started running.

Suddenly, a group of four or five men wearing masks and hooded sweatshirts approached the vehicle and started searching the backseat. They began hitting Callaway, who was in a fetal position, and asking him where everything was located.

Callaway then heard a shot. The men who had been searching Jeremy's vehicle ran away, and Callaway saw the man who had previously held a gun to his face standing close by. Callaway slid into the driver's seat and tried, without success, to start the vehicle. Callaway then saw Jeremy lying on the ground and ran to him. Callaway searched Jeremy's bleeding body for a phone because the men had taken Callaway's phone. When Callaway did not find a phone on Jeremy's person, he ran to the vehicle, located Jeremy's phone, and called 911 and Jeremy's parents.

Indianapolis Metropolitan Police (IMPD) Officer Erica Jones was dispatched to the scene. When Officer Jones arrived, Jeremy was lying in the middle of the parking lot with his eyes open, but he had a blank stare, was gurgling, and unable to speak. Officer Jones saw that among the vehicles in the parking lot, there was a Buick that had backed into another vehicle, and was parked "catty-corner and just stood out." Tr. p. 46. Officer Jones ran the license plate of the Buick and discovered it was registered to Laura Swift, Jeremy's mother. Callaway, who was extremely distraught, was kneeling next to Jeremy. Paramedics transported Jeremy to Wishard Memorial Hospital. Officer Jones called for a homicide unit.

IMPD Officer Lesia Moore, a detective in the homicide unit, responded to the call. When Detective Moore arrived, Jeremy had already been taken away and Callaway, who

4

had Jeremy's phone, was sitting in Officer Jones's cruiser. Callaway told Detective Moore that he and Jeremy were selling marijuana. Detective Moore looked at Jeremy's phone and noticed that around the time of the shooting, the phone received and made calls to and from a number that was later determined to be a prepaid phone registered to Dion Johnson.

The police searched Jeremy's vehicle, which had the odor of marijuana, and located a small amount of marijuana and two scales in the passenger floor. In the trunk, the police located a cup and a large amount of sandwich bags. Callaway later discovered that the men took the rest of the marijuana and some money from him.

Jeremy had suffered a gunshot wound to the back of his head and died from his injuries the following day. The murder weapon was not recovered.

On January 29, 2009, IMPD Officer Steven Scott responded to a dispatch about a possible stolen vehicle that was occupied by two black males. Officer Scott located the vehicle and saw two black men running from the vehicle. Officer Scott and other officers captured one of the men, who was later identified as Victor Smith. Other officers captured Johnson and both men were transported to jail. When the items on the men were inventoried, Smith had a face mask and a black and brown hooded jacket on his person.

Corionna Johnson[3] knew Johnson and Jeremy and was also aware that Jeremy had been shot and killed in January 2009. On February 10, 2009, Johnson talked to Corionna on the phone and accused her of being a "snitch." Tr. p. 437-38. On February 11, 2009, Corionna saw Johnson with his girlfriend, and the three went inside a store together. When the three left the store, Johnson said to Corionna, "B*tch, you're a snitch. Snitch on this." Tr. p. 442. Johnson then shot Corionna on the left side of her face and walked off. Corionna fell to the ground and subsequently spent a day at the hospital but survived the incident. Corionna had not spoken to the police about Johnson's involvement in Jeremy's murder.

Fingerprint analysis showed that Smith's right thumb print was on the outside of the passenger side of Jeremy's car. Smith's fingerprint was also found on Callaway's cell phone, which the police located in a grassy area off of I-70 near the Emerson Avenue ramp.

On May 29, 2009, the grand jury indicted Johnson and Smith on four felony counts: Count I, murder; Count II, felony murder; Count III, class B felony robbery; and Count IV, class B felony attempted robbery. On April 28, 2010, the State filed a notice of intent to introduce evidence under Indiana Evidence Rule 404(b). The trial court granted the State permission to use Rule 404(b) evidence, and Johnson filed a motion to reconsider, which was denied on the first day of trial.

---

[3] Corionna is not related to the Appellant-defendant herein.

6

Johnson and Smith were tried together; their jury trial commenced on May 23, 2011. During Corionna's testimony, Johnson and Smith lodged continuing objections to her testimony. The trial court admitted her testimony over their objections.

On May 24, 2011, Detective Roy West from the Marion County Prosecutor's Office attempted to bring Callaway to the trial to testify for the State. However, when Detective West arrived, his Grandmother informed him that she had not seen Callaway since the previous Sunday and indicated that "he is fearful of coming to court for fear something is going to happen to him." Tr. p. 300. After additional attempts to secure Callaway's trial testimony failed, the trial court admitted his May 19, 2011 deposition as State's Exhibit 25.

On May 26, 2011, the jury found Johnson not guilty of murder but guilty of felony murder, robbery and attempted robbery.[4] On July 20, 2011, the trial court sentenced Johnson to sixty-five years for felony murder with the last three years to be served in community corrections. Additionally, the trial court sentenced Johnson to ten years for robbery to be served concurrently with his sentence for felony murder. The trial court merged the attempted robbery conviction into the felony murder conviction and did not impose a sentence on that count. However, Johnson was subsequently charged and pleaded guilty to attempted murder for shooting Corionna under Cause Number 49G22-0902-FA-024927. His sentence in the instant case was ordered to run consecutively to the sentence he received in that case. Johnson now appeals.

[4] The jury found Smith not guilty of murder and guilty of robbery and attempted robbery. The jury did not reach a verdict as to the felony murder count.

7

DISCUSSION AND DECISION

Johnson's sole argument on appeal is that the trial court erred when it admitted Corionna's testimony that Johnson had called her a snitch and shot her in the face. The State counters that the totality of the circumstances suggests that Johnson shot Corionna to silence her as a potential witness against him, which shows his knowledge and guilty conscience.

The admission or exclusion of evidence falls within the sound discretion of the trial court, and the trial court's determination regarding the admissibility of evidence is reviewed on appeal only for an abuse of that discretion. Wilson v. State, 765 N.E.2d 1265, 1272 (Ind. 2002). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. Sallee v. State, 777 N.E.2d 1204, 1210 (Ind. Ct. App. 2002). The reviewing court will not reverse the trial court's decision to admit or exclude evidence if that decision is sustainable on any ground. Crawford v. State, 770 N.E.2d 775, 780 (Ind. 2002).

Indiana Evidence Rule 404(b) states: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The rationale behind Rule 404(b) is that the jury is precluded from making the "forbidden inference" that the defendant had a criminal propensity and, therefore, engaged in the charged conduct. Thompson v. State, 690 N.E.2d 224, 233 (Ind. 1997). The list of

8

"other purposes" in Rule 404(b) is not exhaustive, and extrinsic evidence may be admitted for any purpose not specified in the Rule unless precluded by the first sentence of the Rule or any other Rule. Id. Generally, the manufacture, destruction, or suppression of evidence may properly be considered by the jury as an admission of the defendant's guilt or his guilty knowledge. Larry v. State, 716 N.E.2d 79, 81 (Ind. Ct. App. 1999). The second step of a Rule 404(b) analysis is to balance the probative value of the evidence against its prejudicial effect pursuant to Indiana Evidence Rule 403. Id.

Here, Corionna testified that she knew both Johnson and Jeremy and was aware that Jeremy had been shot and killed in January 2009. Tr. p. 436-37. A little over two weeks after Jeremy's murder, on February 10, 2009, Johnson accused Corionna of being a snitch when he talked to her on the phone. Id. at 437-38. The next day, Corionna walked into a store with Johnson and his girlfriend. When the three of them left the store, Johnson again called Corionna a snitch and shot her in the face. Id. at 442-43.

We cannot agree with the State that the totality of these circumstances suggests that Johnson shot Corionna to silence her as a possible witness. To be sure, Corionna did not provide any information to the police regarding the robbery and murder, and Johnson did not accuse Corionna of providing such information to the police. Accordingly, we cannot say that Corionna's testimony was evidence of Johnson's knowledge of the robbery and murder or his guilty conscience, and it was, therefore, irrelevant.

Nevertheless, not every trial error in admitting or excluding evidence requires reversal. Turben v. State, 726 N.E.2d 1245, 1247 (Ind. 2000). Indeed, errors in the

9

admission of evidence are to be disregarded as harmless unless they affect the substantial rights of the party, which are assessed by its probable impact on the jury. Id.

In this case, the State presented evidence that Johnson and a companion entered Jeremy's vehicle and purchased $5 worth of marijuana. State's Ex. 25 p. 35. Johnson and the companion then exited the vehicle, but the companion grabbed Callaway's hood and held a gun to his face. Id. at 37. After an unsuccessful attempt to drive away, Jeremy started running while a group of four or five guys searched the backseat of his vehicle, hitting Callaway and demanding to know where everything was located. Id. at 40-45. Callaway then heard a gunshot, and the men who had searched Jeremy's vehicle ran away, but Callaway saw the man who had held a gun to his face standing close by. Id. at 47. Callaway then saw Jeremy lying on the ground and later discovered that the men had taken the rest of the marijuana and some of the money. Id. at 52. In light of this evidence, the trial court's error in admitting Corionna's testimony was harmless.

The judgment of the trial court is affirmed.

KIRSCH, J., and BROWN, J., concur.